IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

STEVEN LAMAR JONES,
RICKY DAVIS, and RANDRIA
LaSHAWN SMITH-JONES

CRIMINAL CASE NO.

1:12-cr-00380-WSD-RGV

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Defendants Steven Lamar Jones ("Jones"), Ricky Davis ("Davis"), and Randria LaShawn Smith-Jones ("Smith-Jones") are charged in a two-count indictment with conspiring to possess with the intent to distribute and attempting to possess with the intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and 846. [Doc. 25].[1]  Jones has filed a motion to suppress evidence of wire communications, [Doc. 81], and Davis has filed a motion to suppress statements. [Doc. 57].[2]  An evidentiary hearing on Davis' motion was held

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Davis and Smith-Jones also filed motions to suppress wiretap evidence, [Docs. 56, 60], but failed to perfect these motions, and the motions were deemed abandoned.  [Doc. 84 at 4-5].  Smith-Jones has not filed any other motions.

on April 1, 2013,[3] after which the parties filed post-hearing briefs, [Docs. 85 & 100].

For the following reasons, it is hereby **RECOMMENDED** that Davis' motion to

suppress statements, [Doc. 57], and Jones' motion to suppress evidence of wiretap

communications, [Doc. 81], be **DENIED**.

## I. FACTUAL BACKGROUND

On October 25, 2012, at approximately 3:15 p.m., Davis was arrested without

incident by Georgia State Patrol ("GSP") Troopers Doug Allen ("Trooper Allen")

and Chris Matthews ("Trooper Matthews"), in the parking lot of a Waffle House

restaurant located at 109 Forest Parkway, Forest Park, Georgia, after he attempted

to make a controlled buy of five kilograms of cocaine from undercover High

Intensity Drug Trafficking Areas ("HIDTA") Task Force Officer Robert Keim

("Officer Keim").[4]   (Tr. at 3, 5-6, 24, 32-33, 44); see also [Doc. 1 at 26-34].   After

---

[3] See [Doc. 79] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." Additionally, the government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. ___)."

[4] The investigation was part of an undercover operation, which involved a federal wiretap investigation, targeting individuals suspected of trafficking narcotics.  See [Doc. 1 at 5-7, 17-34].  In particular, a series of intercepted calls led to the events that occurred on October 25, 2012, and the subsequent arrest of Davis. [Id. at 17-34]; see also (Tr. at 23-24).  Troopers Allen and Matthews accompanied the HIDTA arrest team in their marked patrol vehicles on October 25, 2012, to give a "uniform presence," but once the signal was given for the HIDTA arrest team to move in, the arrest team failed to respond and instead Troopers Allen and Matthews each responded in their respective marked patrol vehicles and arrested Davis.  (Tr.

Troopers Allen and Matthews responded to the "take down" signal, they exited their patrol vehicles, and with their service weapons drawn, ordered Davis, who was standing in the doorjamb of his car, to lie on the ground.[5]  (Tr. at 7-8, 13).  Davis initially made a movement towards the center console of his car, but he then complied with Troopers Allen and Matthews' commands by lying on the ground, at which time Trooper Allen placed him in handcuffs, walked him back to his patrol vehicle, searched his person for weapons or contraband, and then placed him in the backseat of his patrol vehicle.  (Tr. at 8-9, 12, 14).[6]  After approximately eight or nine minutes, Trooper Allen transported Davis to the GSP Post located less than a mile from the Waffle House restaurant and relinquished custody of Davis to Drug

_____

at 4-6).

    [5] Trooper Allen testified that he and Trooper Matthews drew their weapons because they knew that drugs were involved in the investigation and that guns are often associated with drug transactions.  (Tr. at 13).

    [6] At this time, other law enforcement agents had arrived on the scene and although Trooper Allen testified that he had observed one of the agents speaking to Davis while he was sitting in the backseat of his patrol vehicle, he also testified that he could not hear what was being said.  (Tr. at 9).  Trooper Allen also testified that he did not observe any other law enforcement agents threaten Davis or make him any promises.  (Id.).

Enforcement Administration Special Agent Marlon Moye ("Agent Moye") and
HIDTA Task Force Officer Simon Byun ("Officer Byun").[7]  (Tr. at 9-11, 15, 17).

At this time, Agent Moye and Officer Byun, who were armed and dressed in
plain clothes, removed the GSP handcuffs and replaced them with their own set of
handcuffs as well as an extra set in order to alleviate Davis' complaints of shoulder
discomfort.  (Tr. at 17-18).  They then placed Davis in Officer Byun's vehicle, which
was a Dodge Caravan, in order to transport him to the Atlanta HIDTA office, and
prior to leaving, Agent Moye advised Davis "not to discuss the case because [they]
had no knowledge of the investigation, and that once he got to the Atlanta HIDTA
office, he will discuss the investigation with two detectives there."  (Tr. at 18-19).
Davis acknowledged Agent Moye's advisement by shrugging his shoulders and
shaking his head as if he understood and agreed.  (Tr. at 19).[8]  Once they arrived at

---

[7] Trooper Allen testified that he did not recall having any conversation with
Davis during the short drive to the GSP Post and he stated that Davis actually
"seemed happy" and "was real giggly."  (Tr. at 10, 13-14).  In fact, a photograph
taken of Davis as he was exiting the patrol vehicle at the GSP Post depicts him as
smiling.  See (id.; Gov. Ex. 2).  Trooper Allen also testified that at no time during his
encounter with Davis did he use any physical force or make him any promises and
that Davis did not appear to be under the influence of any drugs or alcohol.  (Tr. at
11, 14).

[8] Agent Moye testified that Davis did not make any statements during the
approximately 20-minute drive to the HIDTA office and that Davis' demeanor
during the drive was "happy-go-lucky like not a care in the world."  (Tr. at 19-20).
Agent Moye also testified that neither he nor any other agent in his presence
physically or verbally threatened Davis or made him any promises.  (Id.).

the HIDTA office, which was at approximately 4:20 p.m., Agent Moye and Officer Byun transferred custody of Davis to HIDTA Task Force Officers Michael Hannan ("Officer Hannan") and Charles Cook ("Officer Cook"), both of whom were dressed in plain clothes and were unarmed, to be booked.  (Tr. at 20, 24-26).

Officers Hannan and Cook placed Davis in a booking room[9] and removed his handcuffs shortly thereafter in order to begin the booking process.  (Tr. at 25-26). Officer Hannan testified that Davis was "kind of laid back[,] kind of carefree" with a "big smile on his face."[10]  (Id.).  During the booking process, Officer Hannan asked Davis routine booking questions such as "his name, birthday, address, phone numbers, family members, driver's license information, [and] anything that we might use for that."  (Tr. at 27).  Officer Hannan testified that there was also "some small amount of casual conversation" during the booking process.  (Id.). Specifically, Officer Hannan stated that in conjunction with asking Davis about his job, Davis explained that he was a personal trainer and that the officers commented that he "appeared to be very fit."  (Id.).  Officer Hannan also stated that they advised him that his brother, co-defendant Jones, had been arrested and that he was

_____

[9] Officer Hannan testified that the booking room was a "fairly small room, maybe 12 foot by 12 foot."  (Tr. at 25).

[10] Officer Hannan testified that Davis did not appear to be under the influence of drugs or alcohol.  (Tr. at 27, 38).

involved in an accident when he attempted to flee from the police. (Tr. at 27, 36-37). Davis asked if his brother was okay, and Officer Hannan advised him that his brother "was okay, but he was hurt a little bit." (Tr. at 28, 37).

Aside from these conversations, Officer Hannan testified that Davis was also "just talking out loud to himself or talking to somebody but not in response to a question" and that he stated, "You got me," "I belong in prison because . . . I keep doing things that put me there," that "he knew something was up because that's why he told [Jones] to leave," and that he had seen somebody with a camera taking pictures while he was at the location. (Tr. at 28, 35-37). Officer Hannan stated that these remarks were not in response to any questions he or any other officer asked, or any statements that he or any other officer made, to Davis. (Tr. at 28-29, 37).

After completing the booking process, Officers Hannan and Cook transported Davis to another nearby room, which was nearly identical in appearance and size to the booking room, to be interviewed. (Tr. at 29). At this time, Officer Hannan advised Davis, who remained unhandcuffed, of his <u>Miranda</u>[11] rights by reading these rights in English from a pre-printed Advice of Rights form. (Tr. at 30-31, 39; Gov. Ex. 3). In particular, Officer Hannan advised Davis that he had the right to remain silent, that any statements he made could be used against him in court, and

---

[11] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

that he had the right to speak to an attorney, to have one present during the questioning, and to have one appointed for him if he could not afford one. (Gov. Ex. 3). Officer Hannan asked Davis, who acknowledged that he understood his rights, whether he was willing to waive his rights and make a statement, and Davis indicated that he did not wish to waive his rights, and he refused to sign the form. (Tr. at 31-32, 40; Gov. Ex. 3). Thereafter, the officers refrained from asking Davis any questions. (Tr. at 40).

Davis remained in the interview room for approximately one hour as the officers completed the paperwork to book him into jail. (Tr. at 33). At some point during this time, Officer Keim walked by the interview room and then returned and stepped in to see if the officers needed any assistance. (Tr. at 32, 41-43, 45, 50-53). Officer Hannan testified that when Davis saw Officer Keim, he looked at him and said, "You cost me 30 years."[12] (Tr. at 32, 42). Thereafter, Officers Hannan and Keim transported Davis from the HIDTA office to the Atlanta City Detention Center ("ACDC"). (Tr. at 33).[13] At some point during the approximately 10-minute car

[12] Officer Keim testified that while he observed that Davis was speaking, he did not recall hearing any of Davis' statements when he stepped into the interview room. (Tr. at 48, 53, 56).

[13] Officer Hannan drove the vehicle while Davis was seated in the front passenger seat and Officer Keim was seated in the rear driver-side seat. (Tr. at 46, 54-55). Officer Hannan could not recall whether another officer was present in the car while they transported Davis to ACDC, (Tr. at 33-34; however, Officer Keim

ride, Davis turned to Officer Keim and said, "You cost me 30 years."[14]  (Tr. at 46).

Officer Keim responded that Davis did it to himself.  (Tr. at 47, 53).[15]

## II.  DISCUSSION

**A.**  **Davis' Motion to Suppress Statements, [Doc. 57]**

**1.**  *Custodial Interrogation*

"*Miranda*  warnings are required before any statement may be admitted into

evidence at trial which was elicited from a person in custody through interrogation."

United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal

marks omitted); see also Miranda, 384 U.S. at 436.   "Custody" for purposes of

triggering Miranda advisements occurs when "there has been a formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest."

United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation and internal

marks omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

"Interrogation . . . must reflect a measure of compulsion above and beyond that

---

testified that another officer was in the vehicle, though he could not recall who the
officer was, (Tr. at 46, 55).

[14] Officer Hannan testified that he did not recall any specific statements that
were made by Davis during the transport to ACDC.  (Tr. at 34).

[15] During the time Davis was in Officer Hannan's custody, Davis was not
physically or verbally threatened in any way and was not made any promises.  (Tr.
at 34, 47).

inherent in custody itself." United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (internal marks omitted) (quoting Rhode Island v. Innis, 446 U.S. 291, 300 (1980)). "Thus, *Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'" Id. (citation omitted).[16]   The Supreme Court has defined the "functional equivalent" of interrogation as "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (quoting Innis, 446 U.S. at 300-01). Thus, "[n]otwithstanding the booking exception, police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." Chavez-Maciel, 2012 WL 6742323, at *9 (citation omitted).

---

[16] In fact, courts "have recognized a routine booking question exception which exempts from *Miranda*'s coverage questions to secure biographical data necessary to complete booking or pretrial services." United States v. Chavez-Maciel, Criminal Action No. 1:10–CR–00490–TCB–LTW, 2012 WL 6742323, at *9 (N.D. Ga. Dec. 7, 2012), adopted by 2012 WL 6738771, at *1 (N.D. Ga. Dec. 31, 2012) (citations and internal marks omitted).  Thus, "[l]aw enforcement's questions regarding an individual's name, address, height, weight, eye color, date of birth, and age fall within the routine booking question exception." Id. (citation omitted).

"In determining whether an exchange was the functional equivalent of an interrogation, the focus of the inquiry is the perception of the suspect, not the intent of the police." United States v. Suarez, 162 F. App'x 897, 901 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).  Davis bears the burden of establishing that he was in custody and that his statements were made in response to government questioning, see United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977),[17] and the government bears the burden of proving that Davis' statements were voluntarily given, see Colorado v. Connelly, 479 U.S. 157, 168 (1986).

It is undisputed that Davis was in custody at the time he made the statements at issue.   See [Doc. 85 at 4; Doc. 100 at 7].  Davis' motion, however, is due to be denied because he has not shown that he made statements in response to interrogation by law enforcement.  Davis first seeks to suppress the statements he made to HIDTA Officers Hannan and Cook during the booking process before he was advised of his Miranda rights.  See [Doc. 85 at 5-6].  Officer Hannan testified that there was some "casual conversation" outside of the routine booking questions that occurred during the booking process.  See (Tr. at 27-28).  Specifically, Officer Hannan stated that he advised Davis that his brother had been arrested and was

---

[17] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

involved in an accident when he attempted to flee from the police, and after Davis

asked if his brother was okay, Officer Hannan responded that he was "hurt a little

bit" but was okay.  (Tr. at 27-28, 36-37).  This exchange did not require Miranda

warnings because Officer Hannan's comments did not invite or elicit a response

from Davis or encourage him to make spontaneous incriminating remarks.  See

Shedelbower v. Estelle, 885 F.2d 570, 572-73 (9th Cir. 1989) (finding that truthfully

informing suspect that his accomplice was in custody and that the victim had

identified him, though untrue, was not the functional equivalent of interrogation).[18]

Indeed, "[a]n officer telling a suspect what is happening or what charges have been

made against him is not 'interrogation' for *Miranda* purposes."  United States v.

Durand, Crim. No. 11–228 (MJD/JJK), 2011 WL 5444112, at *6 n.10 (D. Minn. Oct. 24,

2011) (citation omitted).

---

[18] Informing a suspect of the charges against him or the basis for his arrest does not constitute interrogation. See Springfield, 2007 WL 1140912, at *3 (collecting cases).  Courts have reasoned that explanation of charges is "normally attendant to arrest and custody" and is therefore excluded from the definition of interrogation because it does not "reflect a measure of compulsion above and beyond that inherent in custody itself."  Innis, 446 U.S. at 300-01.  Likewise, Officer Hannan's statement regarding Davis' brother merely provided information regarding the case and investigation "normally attendant to arrest and custody."  Id. at 301; see also United States v. Crisco, 725 F.2d 1228, 1232 (9th Cir. 1984) (citation omitted) (noting that "when an officer informs a defendant of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody").

In addition, according to the testimony at the evidentiary hearing, Davis'
remarks that "You got me," "I belong in prison because . . . I keep doing things that
put me there," that "he knew something was up because that's why he told [Jones]
to leave," and that he had seen somebody with a camera taking pictures, see (Tr. at
28, 35-37), were merely "spontaneous statement[s] and not made in response to
interrogation or its equivalent," triggering Miranda warnings. United States v .
Cary, No. 1:07-cr-74-WSD, 2008 WL 80650, at *18 (N.D. Ga. Jan. 4, 2008), adopted at
*7. In fact, based on the record before the Court, "[e]ach statement was totally
voluntary and clearly outside the protective umbrella of *Miranda*." United States v.
Bodiford, Criminal Action File No. 1:10–CR–395–TCB–AJB, 2011 WL 1118512, at *3
(N.D. Ga. Feb. 22, 2011), adopted by 2011 WL 1100687, at *1 (N.D. Ga. Mar. 24, 2011)
(citation and internal marks omitted).

Additionally, Davis, after being advised of his Miranda rights and refusing
to waive them, observed Officer Keim enter the interview room, and Davis made a
spontaneous statement that Officer Keim had cost him 30 years. See (Tr. at 30-32,
39, 42; Gov. Ex. 3). Although Officer Keim did not hear Davis' statement at that
time, Officer Keim testified that Davis made a similar spontaneous statement to him
in the car on the way to the ACDC. See (Tr. at 46-48, 53, 56).[19] As the government

---

[19] Davis asserts that "[i]n order for the Government to carry its burden . . ., the
Court must rely solely on the testimony of [Officer Hannan] despite the direct

points out, "[t]here is no indication that Davis'[] comments were prompted by anything other than the mere sight of [Officer] Keim," [Doc. 100 at 10], and there was no functional equivalent of interrogation.

The "totality of the circumstances indicates that [Davis'] statement[s] [were] spontaneous and not elicited by the functional equivalent of interrogation." United States v. Hickman, No. 8:12–CR–472–T–17EAJ, 2013 WL 672580, at *5 (M.D. Fla. Jan. 24, 2013), adopted by 2013 WL 672681, at *1 (M.D. Fla. Feb. 25, 2013) (citation omitted). There is simply "no evidence that the agents made any statements or

---

contradiction of his testimony by [Officer Keim], who testified that the 'you cost me 30 years' statement happened during the drive to ACDC, not in the interrogation room." [Doc. 85 at 5]. Davis, however, misconstrues Officers Hannan and Keim's testimony. Indeed, Officer Hannan simply testified that he heard Davis make the statement when Officer Keim walked into the interview room, but that he did not recall whether he had made any statements during the transport to ACDC, see (Tr. at 32, 24, 42), whereas Officer Keim testified that he had observed Davis making statements in the interview room but did not recall hearing what was actually said, but that Davis turned and looked at him during the car ride to the ACDC and said, "You cost me 30 years," see (Tr. at 46-48, 53, 56). Despite Davis' argument to the contrary, [Doc. 85 at 5], there was no "direct contradiction" between these officers' testimony at the hearing as it may reasonably be concluded from their testimony that Davis made this statement twice, and the Court finds that there is no other reason to call into question Officer Hannan's credibility. See United States v. Armstrong, No. CR213–008, 2013 WL 3778410, at *1 n.1 (S.D. Ga. July 17, 2013), adopted at *1 (citation and internal marks omitted) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony."); see also United States v. Dixon, 491 F. App'x 120, 121 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted) ("The resolution of a credibility dispute is within the province of the fact finder, and will not be reversed for clear error unless the testimony is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it.").

engaged in any actions reasonably likely to elicit an incriminating response from [Davis]," United States v. Perry, Criminal Indictment No. 2:11–CR–0026–RWS–SSC, 2012 WL 601892, at *11 (N.D. Ga. Jan. 19, 2012), adopted by 2012 WL 601890, at *1 (N.D. Ga. Feb. 23, 2012) (citation and internal marks omitted), and there is likewise no evidence that "force or coercion [was] used or interrogation directed at [Davis]," United States v. Matayoshi, No. 2:11–cr–29–FtM–36SPC, 2011 WL 4903075, at *8 (M.D. Fla. Sept. 22, 2011), adopted by 2011 WL 4902963, at *2 (M.D. Fla. Oct. 14, 2011).[20]  In sum, the Court finds that no interrogation or its functional equivalent occurred because law enforcement's actions and words were not reasonably likely to elicit an incriminating response from Davis.

---

[20] Davis argues that the fact that he was "approached and arrested by armed officers who trained their .45 caliber Glock handguns on him and was transported from location to location by armed officers in uniform" coupled with the fact that he was advised that his brother was involved in a motor vehicle accident while attempting to flee police during his arrest "contribute to a finding that the officers knew that this overwhelming situation would be likely to elicit an incriminating response from [Davis]."  [Doc. 85 at 6].  However, the testimony before the Court makes it clear that Davis' statements were not the result of interrogation or its functional equivalent but were instead made voluntarily and spontaneously. Indeed, "even if the circumstances of an arrest are inherently coercive, the defendant must show a link between the coercion and his statements to establish that he was subjected to the functional equivalent of interrogation." United States v. Young, 377 F. App'x 965, 969 (11th Cir. 2010) (per curiam) (unpublished) (citing United States v. Glen-Archila, 677 F.2d 809, 815 (11th Cir. 1982)).  Here, Davis did not make his incriminating statements immediately following his arrest, but volunteered them later during the booking process, which militates against finding that the circumstances of his arrest amounted to the functional equivalent of interrogation. See id.

14

2.    *Voluntariness*

The United States Supreme Court's holding in <u>Jackson v. Denno</u>, 378 U.S. 368

(1964), governs the voluntariness of confessions, and provides in pertinent part:

> It is now axiomatic that a defendant in a criminal case is deprived of
> due process of law if his conviction is founded, in whole or in part,
> upon an involuntary confession, without regard for the truth or falsity
> of the confession, and even though there is ample evidence aside from
> the confession to support the conviction.

<u>Id.</u> at 376 (internal citation omitted).  <u>See also</u> <u>United States v. Stafford</u>, No.

CR208-15, 2009 WL 819377, at *2 (S.D. Ga. Mar. 13, 2009), adopted at *1.  To be

voluntary, a confession must be "the product of an essentially free and

unconstrained choice."  <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961).  "A

confession is not 'voluntary' pursuant to the Due Process Clause when law

enforcement officials have used coercive conduct."  <u>Stafford</u>, 2009 WL 819377, at *2

(<u>citing</u> <u>Connelly</u>, 479 U.S. at 167).

"Coercion can be mental or physical," and "[t]he test for determining if a

confession is the result of coercion requires a review of the 'totality of the

circumstances.'"  <u>Id.</u> (citations omitted). "Sufficiently coercive conduct normally

involves subjecting the accused to an exhaustingly long interrogation, the

application of physical force or the threat to do so, or the making of a promise that

induces a confession."  <u>Id.</u> (citations and internal marks omitted); <u>see also</u> <u>Hutto v.</u>

15

<u>Ross</u>, 429 U.S. 28, 30 (1976).  "Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment."   <u>United States v. Thompson</u>, 422 F.3d 1285, 1296 (11th Cir. 2005).  However, "'[a]bsent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law.'"   <u>Id.</u> (alteration in original) (quoting <u>Connelly</u>, 479 U.S. at 164).  "'Indeed, far from being prohibited by the Constitution, admissions . . ., if not coerced, are inherently desirable . . . . [and] [a]bsent some officially coerced [testimony], the Fifth Amendment privilege is not violated by even the most damning admissions.'"   <u>United States v. Sharma</u>, No. 6:09-CR-1-ORL-19GRJ, 2009 WL 152868, at *8 (M.D. Fla. Jan. 21, 2009), adopted at *1 (alterations in original) (quoting <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977)).

Under the totality of circumstances in this case, the Court finds that Davis' statements were not obtained as a result of coercion and were voluntarily given. Specifically, the officers testified that they did not make any promises to Davis in exchange for his statements, that they did not use physical force against him, and that he was not threatened in any way during the encounter.  (Tr. at 9, 11, 19-20, 34, 47).  In fact, a photograph taken shortly after Davis' arrest and transport to the GSP Post depicts him as smiling, <u>see</u> (Gov. Ex. 2), and his demeanor was described as

16

"happy-go-lucky" and "carefree" throughout the encounter, (Tr. at 10, 19, 26). Additionally, there is no evidence that Davis was under the influence of drugs or alcohol. (Tr. at 14, 27, 38).

In short, "[t]here is no evidence of objective coercive police activity," and Davis has not shown "that his will was overborne, or that any police misconduct motivated him to make his incriminating statements." United States v. Sylvester, 330 F. App'x 545, 548 (6th Cir. 2009) (unpublished); see also Bodiford, 2011 WL 1118512, at *3. "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Connelly, 479 U.S. at 164). "That type of coercive conduct simply does not exist in this case." Id. Here, "[t]he record is entirely bereft of any evidence that the [officers] utilized any coercive techniques in this case." United States v. Baskerville, No. CR406-304, 2006 WL 3623533, at *5 (S.D. Ga. Dec. 11, 2006), adopted at *1. Therefore, Davis' statements are not subject to suppression as the Court finds, under the totality of the circumstances, they were given freely and voluntarily. See Perry, 2012 WL 601892, at *12. Accordingly, it is **RECOMMENDED** that Davis' motion to suppress his statements, [Doc. 57], be **DENIED**.

**B.**   <u>**Jones' Motion to Suppress Evidence, [Doc. 81]**</u>

After being granted multiple extensions of time to file pretrial motions, <u>see</u> [Docs. 52, 63, 70], on April 22, 2012, Jones filed a motion to suppress intercepted communications.  [Doc. 81].  Unlike his co-defendants Davis and Smith-Jones, who requested and were granted leave to perfect their initial motions to suppress wiretap evidence, <u>see</u> [Docs. 68, 75], Jones did not seek further leave to perfect or supplement his motion.  The Court granted the parties several extensions of time to file their briefs on Jones' motion, <u>see</u> [Docs. 84, 87, 94, 101], and subsequently established a briefing schedule by which the government had until July 2, 2013, to file its response and Jones had until July 22, 2013, to file his reply.  <u>See</u> [Doc. 101].

On June 28, 2013, the government filed its response to Jones' motion to suppress, [Doc. 99], contending that the motion was nearly identical to the wiretap suppression motion filed by Davis which the Court had ruled "was insufficient because it asserted only 'perfunctory arguments that are manifestly insufficient to enable the court to conclude that [he] present[ed] a substantial claim,'" [Doc. 98 at 3 (quoting <u>United States v. Flores</u>, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *2 (N.D. Ga. Sept. 27, 2007) (internal marks omitted))].  The government asserts that Jones' motion is not sufficiently particularized to raise any issues for the Court's review. [Doc. 99 at 2-3].  Jones did not file a reply addressing the government's

contentions or in any way attempt to supplement his initial motion.  Thus, Jones'
initial motion to suppress, [Doc. 81], is the only motion for the Court's consideration.

Jones' motion to suppress intercepted communications consists of nothing
more than generic assertions.  <u>See generally</u> [Doc. 81].  In fact, Jones has not
identified any specific basis for his suppression motion aside from asserting
conclusory and vague statements that the wiretap evidence should be suppressed
for the government's failure to minimize, because the affidavit lacks probable cause,
the confidential sources were not reliable, and that the application was based on
rumors that were not substantiated, among other perfunctory arguments.  <u>See</u> [<u>id.</u>
at 4].  Indeed, as the government correctly points out, Jones' motion is nearly
identical in substance to Davis' motion to suppress wiretap evidence, <u>see</u> [Doc. 56],
which Davis failed to perfect, <u>see</u> [Doc. 75], and the motion was deemed abandoned,
<u>see</u> [Doc. 84 at 4-5].  Davis subsequently moved to reinstate his motion to suppress
wiretap evidence, <u>see</u> [Doc. 95], which this Court denied on June 26, 2013, <u>see</u> [Doc.
98], noting that his "initial motion to suppress wiretap evidence was insufficient
because it asserted only perfunctory arguments that are manifestly insufficient to
enable the court to conclude that he presented a substantial claim," [<u>id.</u> at 3
(alterations, citations, and internal marks omitted)].

Likewise, Jones' motion to suppress "presents only perfunctory arguments and was not supplemented with any specific allegations supporting the motion." Flores, 2007 WL 2904109, at *15 (citation omitted).   Accordingly, the motion is insufficient as a matter of law.  United States v. Damiani, Criminal Action File No. 1:10–CR–519–AT/AJB, 2011 WL 7574628, at *6 (N.D. Ga. Sept. 23, 2011), adopted by 2012 WL 983726, at *1 (N.D. Ga. Mar. 20, 2012).  Indeed, "[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . . A court need not act upon general or conclusory assertions. . . ." Id. (second and third alterations in original) (citation and internal marks omitted).  Jones' motion is a "boilerplate motion which fails to assert facts (as opposed to legal conclusions) which if proven would entitle[] him to relief," id., and is therefore due to be denied. Flores, 2007 WL 2904109, at *15.  Thus, it is hereby **RECOMMENDED** that Jones' motion to suppress, [Doc. 81], be **DENIED**.[21]

---

[21] Moreover, it appears that Jones may have abandoned the motion to suppress as the government's most recent unopposed motion for extension of time stated that Jones intended to withdraw his motion, [Doc. 97 at 2], and Jones never sought leave to perfect or supplement his general motion, nor did he respond to the government's argument that his motion was due to be denied as waived or abandoned for lack of particularity, see [Doc. 99 at 2-3]; see also United States v. Reyes, Criminal Case Nos. 1:11-cr-00009-ODE-RGV, 1:11-cr-00060-ODE-RGV, 2011 WL 7070980, at *1 n.1 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 176488, at *6 (N.D. Ga. Jan. 19, 2012); United States v. Elder, Criminal Action File No. 1:10–CR–132–RWS/AJB, 2010 WL 5656687, at *3 (N.D. Ga. Dec. 16, 2010), adopted

### III.  CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Davis' motion to suppress statements, [Doc. 57], and Jones' motion to suppress evidence of wire communications, [Doc. 81], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of the case.  **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial as to all defendants.

**IT IS SO ORDERED** and **RECOMMENDED**, this 26th day of August, 2013.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

in part by 2011 WL 294507, at *7 (N.D. Ga. Jan. 27, 2011); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1327 n.3 (N.D. Ga. 2009), adopted at 1326; United States v. Arias, Criminal File No. 1:05-CR-197-1-TWT, 2007 WL 2422034, at *1 (N.D. Ga. Aug. 21, 2007), adopted at 1.